# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **GRANGE INSURANCE COMPANY, et al.,**<br><br>*Plaintiffs,*<br><br>v.<br><br>**CAPITOL SPECIALTY INSURANCE CORPORATION,**<br><br>*Defendant.* | Case No. 5:20-cv-01132-JDW |

## MEMORANDUM

In 2012, a roofing contractor and an eager subcontractor entered into an agreement that would govern their entire relationship going forward, including every job the subcontractor would work on for the next five years. Pursuant to that contract, the subcontractor agreed to add the contractor as an additional insured on its insurance policy. When an accident occurred in 2017, and subcontractor's insurer has tried to avoid its responsibility to defend the contractor in the resulting personal injury action. It has no basis to do so, and the Court will grant summary judgment against that insurer.

## I. BACKGROUND

### A. The Cap Specialty Insurance Policy

Garros Remodeling LLC purchased insurance from Capitol Specialty Insurance Corporation ("Cap Specialty"). Cap Specialty Policy No. CT20150778-02 (the "Policy") was in effect from December 30, 2016, to December 30, 2017. The "Schedule" to the Policy endorsement titled "Additional Insured – Owners, Lessees or Contractors – Scheduled Person or Organization" identifies who is an additional insured under the Policy. The Schedule provides:

| Name Of Additional Insured Person(s) Or Organization(s) | Location(s) Of Covered Operations |
|---|---|
| Any person or organization when you have agreed in writing in a contract or agreement that such person or organization be added as an Additional Insured. | As required by written contract that is executed on or after the policy inception. |

(ECF No. 20-4 at pg. 17 of 19.) The Certificate of Liability Insurance for the Policy during this time sets forth that Bachman's Roofing, Building & Remodeling, Inc., "is listed as Additional Insured with respects to General Liability when a written contract is required." (ECF No. 20-10 at pg. 8 of 9.)

**B.    The Independent Subcontractor Agreement Between Bachman's And Garros**

Bachman's provides roofing and remodeling services to its clients. From 2012 to 2018, Bachman's hired Garros Remodeling LLC as a subcontractor. Luis Garro is Garros' owner. Mr. Garro had prior experience with Bachman's when he worked for his uncle's company, another Bachman's subcontractor. After his uncle retired, Mr. Garro started his own business and approached Bachman's to work as one of its subcontractors. Bachman's owner, Eric Bachman, told Mr. Garro what he would need in order to start working for Bachman's, including insurance. Within a week, Mr. Garro obtained everything Garros needed to start doing subcontracting work for Bachman's, including insurance from Cap Specialty.

On December 7, 2012, Bachman's and Garros entered into an Independent Subcontractor Agreement. Pursuant to that agreement, Garros would "perform certain services for [Bachman's] ('Work') from time to time on a non-exclusive basis as an independent contractor." (ECF No. 20-3 at Art. 2.) The Independent Subcontractor Agreement identified certain "Contract Documents," such as the agreement itself, including any exhibits, as well as the "Agreement between the Owner and the [Bachman's] dated 7/Dec/2012, the Conditions of the Contract between the Owner and the

2

[Bachman's] …, the Drawings, the Specifications, all Addenda issued prior to and all Modifications issued after the execution of the Agreement between the Owner and [Bachman's] and agreed upon by the parties to this Subcontract." (ECF No. 20-3 at Art. 1.) Mr. Garro handwrote the date "7/Dec/2012" in the contract when he signed it and returned it to Bachman's. He did so because he "thought [he] had to put a date here." (ECF No. 20-7 at 33:23-34:1, 54:14-17.) Bachman's is not aware of any contract between it and an Owner dated December 7, 2012. Bachman's therefore understood that the date was put there in error and that Mr. Garro should have left the date blank. (ECF No. 20-6 at 29:19-21.)

Exhibit A to the agreement—Terms and Conditions to Subcontract Agreement—required Garros to obtain at least $1,000,000 in general liability insurance and provide Bachman's with "certificates of insurance naming [Bachman's] as an additional insured for public liability, property damage, automobile liability, and workers' compensation insurance" prior to commencing work. (ECF No. 20-3, Ex. A at ¶ 4.) Exhibit A also included an arbitration provision and elected Pennsylvania law to govern the agreement.

The Independent Subcontractor Agreement is the only written agreement between Bachman's and Garros. Bachman's intended the Independent Subcontractor Agreement to "be in place for all future jobs that the independent subcontractor does for Bachman." (ECF No. 20-6 at 30:5-6; *see also id.* at 48:19-22.) "[T]he intention of the agreement was never designed for it to be relating to a specific job with a specific homeowner." (*Id.* at 56:5-7.) Consistent with that intent, from December 2012 until May 2018, Garros worked as a subcontractor for Bachman's on several projects, at various sites, without executing separate agreements for each project. Instead, when Mr. Garro went to a site to do work for Bachman's, he understood that the Independent Subcontractor Agreement applied to that work.

3

### C. The Scotto Project

On September 19, 2017, Bachman's entered into a Residential Home Improvement Contract (the "Scotto Agreement") with Christopher Scotto to install a new roof and other items at Mr. Scotto's home in Strausstown, Pennsylvania (the "Scotto Project"). Garros worked as a subcontractor on the Scotto Project. During that project, one of Garros' employees, Paulino Garcia Andrade, was electrocuted and fell off Mr. Scotto's roof. He and his wife sued Bachman's and others in the Berks County Court of Common Pleas. The case is *Paulino Garcia Andrade, et al. v. Bachman's Roofing, et al.*, docket number 18-14674 ("the *Andrade* Action"). Plaintiff Grange Insurance Company, Bachman's insurer, has been providing a defense to Bachman's in that case. Cap Specialty has refused to defend or indemnify Bachman's in the *Andrade* Action. Bachman's has filed a Joinder Complaint in that matter against Garros for breach of contract.

### D. Procedural History

On February 28, 2020, Bachman's and its insurer, Grange, brought this suit against Cap Specialty. They contend that Cap Specialty must defend Bachman's in the *Andrade* Action and reimburse Grange for the defense costs it has incurred in that case thus far. The Parties filed cross-motions for judgment on the pleadings on this issue, but the Court denied both motions after determining that a question of fact existed as to whether Garros agreed to add Bachman's as an additional insured on the Cap Specialty policy. In its decision, the Court explained that the remaining question in the case is whether Garros agreed in writing to add Bachman's as an additional insured. (ECF No. 16 at ¶ 14.) Both Parties now seek summary judgment, and the motions are ripe for disposition.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) permits a party to seek, and a court to enter, summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he plain language of Rule 56[(a)] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quotations omitted). In ruling on a summary judgment motion, a court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (quotation omitted). However, "[t]he non-moving party may not merely deny the allegations in the moving party's pleadings; instead he must show where in the record there exists a genuine dispute over a material fact." *Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007) (citation omitted).

The filing of cross-motions does not change this analysis. *See Transportes Ferreos de Venezuela II CA v. NKK Corp.*, 239 F.3d 555, 560 (3d Cir. 2001). It "does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist." *Id.* at 560 (quotation omitted). Rather, "[w]hen confronted with cross-motions for summary judgment 'the court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard.'" *Canal Ins. Co. v. Underwriters at Lloyd's London*, 333 F. Supp. 2d 352, 353 n.1 (E.D. Pa. 2004), *aff'd*, 435 F.3d 431 (3d Cir. 2006).

## III. DISCUSSION

### A. The Independent Subcontractor Agreement Is Ambiguous

Under Pennsylvania law, "interpretation of a written agreement is a task to be performed by the court rather than a jury." *Am. Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 575, 587 (3d Cir. 2009) (citation omitted). "The paramount goal of contract interpretation is to determine the intent of the parties." *Id.* (quotation omitted). When the words of a contract are clear and unambiguous, the express language of the agreement controls. *Id.* (same). However, "a contract is ambiguous, and thus presents a question of interpretation for a jury, if the contract 'is reasonably susceptible of different constructions and capable of being understood in more than one sense.'" *Id.* (same). To determine whether ambiguity exists, the Court can consider "the words of the contract, the alternative meaning suggested by counsel, and the nature of the objective evidence to be offered in support of that meaning." *In re TH Properties*, 752 F. App'x 127, 130 (3d Cir. 2018) (quoting *Bohler-Uddeholm Am., Inc. v. Ellwood Grp., Inc.*, 247 F.3d 79, 93 (3d Cir. 2001)). A court can also consider the parties' course of conduct in determining whether the contract is ambiguous. *See Teamsters Indus. Employees Welfare Fund v. Rolls-Royce Motor Cars, Inc.*, 989 F.2d 132, 135 (3d Cir. 1993). In addition, a court can correct a scrivener's error if a contract contains one. *See Zurich Am. Ins. Co. v. O'Hanlon*, 968 A.2d 765, 770 (Pa. Super. Ct. 2009).

In ruling on the cross-motions for judgment on the pleadings, the Court held the Independent Subcontractor Agreement ambiguous. Nothing in the record alters that conclusion. On the one hand, the agreement refers to another agreement between Bachman's and an Owner dated December 7, 2012. And, the fact that the form of contract included an empty space in which to include a date suggests that the parties expected the Independent Subcontractor Agreement to

apply to a single project, rather than to operate as a master agreement. That evidence supports Cap Specialty's argument that the Independent Subcontractor Agreement applied only to a single job.

But other evidence suggests otherwise. Most notably, there is evidence in the record that Bachman's did not have an agreement with an owner dated December 7, 2012. No one has located such an agreement, and Bachman's corporate representative testified she was not aware of any such agreement. If there was no such agreement, and the Independent Subcontractor Agreement only applied to a job for a contract with that date, then the Independent Subcontractor Agreement would be a nullity. Although Cap Specialty complains that no one from Bachman's looked for such an agreement in Bachman's files, Cap Specialty has to do more than cast some metaphysical doubt on that evidentiary gap. It had the opportunity to take discovery, and if it wanted Bachman's to do a more thorough search, it could have sought relief from the Court. As things stand, the Court can rule only on the record before it. In addition, the Independent Subcontractor Agreement does not define the term "Owner," unlike the terms "Contractor" and "Subcontractor." The agreement also specifies that it is for work "from time to time," not work on a specific project. (ECF No. 20-3 at Art. II.) Finally, the undisputed evidence demonstrates that Bachman's and Garros treated the Independent Subcontractor Agreement as a master agreement, not just as an agreement for a single project, and Garros obtained Certificates of Insurance naming Bachman's as an additional insured every year, as the Independent Subcontractor Agreement required.

All of this conflicting evidence reinforces the Court's earlier conclusion: the Independent Subcontractor Agreement is ambiguous as to whether it applied to a single job or served as a master agreement for all of Garros's work for Bachman's. To resolve that ambiguity, the Court must look to extrinsic, parol evidence. *See Kripp v. Kripp*, 849 A.2d 1159, 1163 (Pa. 2004).

### B. Bachman's And Garros Intended The Independent Subcontractor Agreement To Serve As A Master Agreement

The unrebutted evidence in the record demonstrates that Bachman's and Garros intended the Independent Subcontractor Agreement to govern their relationship on an ongoing basis. It is the only agreement between Bachman's and Garros, yet Garros performed work for Bachman's on numerous jobs for several years. Bachman's intended the agreement to apply to all work that Garros did for Bachman's, not just to a single job. Mr. Garro also understood that when Garros performed work for Bachman's, the Independent Subcontractor Agreement applied to that work.

Cap Specialty does not offer any evidence that calls any of these facts into question. It points to the fact that the Independent Subcontractor Agreement includes the date "7/Dec/2012." But it offers no evidence about what anyone meant by that date. Nor does it offer any evidence to call into question Plaintiffs' evidence that (a) Bachman's did not have a contract with an owner from that date, (b) Bachman's and Garros conducted themselves as though the Independent Subcontractor Agreement was a master agreement, and (c) Mr. Garro testified that he had no particular reason for including that date in the Independent Subcontractor Agreement. Although Cap Specialty challenges the creditability of the testimony that establishes these facts, credibility disputes alone do not permit a party to avoid summary judgment.

Cap Specialty also argues that any interpretation of the Independent Subcontractor Agreement to apply to the Scotto Project would "def[y] reason and logic" because the Independent Subcontractor Agreement came five years before the Scotto Agreement. (ECF No. 21-2 at 12.) Not so. If one treats the Independent Subcontractor Agreement as a master services agreement between Bachman's and Garros—which the undisputed evidence says that it is—then it is by its nature an agreement that contemplates projects in the future. In the absence of some evidence that presents a dispute about the parties' intent in executing the Independent Subcontractor Agreement,

8

Cap Specialty has not demonstrated that there is a triable issue of fact, let alone that it should prevail on summary judgment.

### C. None Of Cap Specialty's Other Arguments Justifies Disregarding The Independent Subcontractor Agreement

#### 1. Mr. Garro's limited understanding of English did not prevent him from entering into the Independent Subcontractor Agreement

Cap Specialty argues that the Independent Subcontractor Agreement was a product of uneven bargaining power because Mr. Garro speaks and reads only limited English. Pennsylvania law follows an objective theory of contract formation. Pursuant to that theory, "[a] true and actual meeting of the minds is not necessary to form a contract.... In ascertaining the intent of the parties to a contract, it is their outward and objective manifestations of assent, as opposed to their undisclosed and subjective intentions, that matter." *Long v. Brown*, 582 A.2d 359, 363 (Pa. Super. Ct. 1990) (quotation omitted); *see also Morales v. Sun Constructors, Inc.*, 541 F.3d 218, 221 (3d Cir. 2008) ("While mutual assent 'is sometimes referred to as a 'meeting of the minds,'' this phrase must not be construed too literally.") (quotation omitted). Under Pennsylvania law, "[a] person of age is presumed to know the meaning of words in a contract, and if, relying upon his own ability, he enters into an agreement not to his best interests he cannot later be heard to complain that he was not acquainted with its contents and did not understand the meaning of the words used in the instrument which he signed." *Schoble v. Schoble*, 37 A.2d 604, 605 (Pa. 1944) (citation omitted). "The 'integrity of contracts demands' that this principle 'be rigidly enforced by the courts.'" *Morales*, 541 F.3d at 221 (quotation omitted). Thus, absent allegations of fraud, a party's inability to read a contract is not a defense to the validity or enforceability of that contract. *See id.* at 222; *Arce v. U-Pull-It Auto Parts, Inc.*, No. 06-cv-5593, 2008 WL 375159, at *7 (E.D. Pa. Feb. 11, 2008); *Appeal of Weller*, 103 Pa. 594, 599 (1883). Cap Specialty does not claim that Bachman's engaged in fraud when it entered into the agreement, and there is no evidence of fraud before the

Court. Without more, the simple fact that Mr. Garro might not have understood the Independent Subcontractor Agreement is not a basis to render the agreement void for lack of assent.

These same doctrines defeat Cap Specialty's argument that Garros did not agree to add Bachman's as an additional insured for the Scotto Project. Cap Specialty contends that because Mr. Garro did not understand what he was signing, he did not "agree" to anything. But that argument misses the point. If Garros entered into a legally-binding contract—and it did, whether Mr. Garro fully understood it or not—then Garros "agreed" to undertake the obligations in that contract.

### 2. The Independent Subcontractor Agreement is not void due to unconscionability

"The ultimate issue of whether a contract or clause is unconscionable is a question of law for a court." *Todd Heller, Inc. v. United Parcel Serv., Inc.*, 754 A.2d 689, 700 (Pa. Super. Ct. 2000) (citation omitted). Thus, "[o]n a motion for summary judgment, a court may conclude, as a matter of law, that a contract or clause is enforceable regardless of an allegation of unconscionability, as long as there is no genuine issue of material fact." *Bishop v. Washington*, 480 A.2d 1088, 1094 (Pa. Super. Ct. 1984) (citations omitted). As an initial matter, whether the Independent Subcontractor Agreement is an adhesion contract is not dispositive. "[M]erely because a contract is one of adhesion does not render it unconscionable and unenforceable as a matter of law." *Salley v. Option One Mortg. Corp.*, 925 A.2d 115, 127 (Pa. 2007). Instead, "[t]o prove unconscionability under Pennsylvania law, a party must show that the contract was both substantively and procedurally unconscionable." *Quilloin v. Tenet Health System Philadelphia, Inc.*, 673 F.3d 221, 230 (3d Cir. 2012).

"A contract is procedurally unconscionable where 'there was a lack of meaningful choice in the acceptance of the challenged provision [.]'" *Id.* at 235 (quotation omitted). When

determining whether a contract rises to the level of procedural unconscionability, courts consider: "the take-it-or-leave-it nature of the standardized form of the document[,]" "the parties' relative bargaining positions," and "the degree of economic compulsion motivating the 'adhering' party[.]" *Id.* at 235-36 (same). Cap Specialty focuses on the parties' relative bargaining positions, and points to the fact that Mr. Garro stopped attending school when he was 13 or 14 years old and cannot read English. Cap Specialty, however, ignores the fact that Mr. Garro immigrated to the United States at age 15, learned a trade, and then started his own business. Even if Mr. Garro's limited education or limited English skills hindered his position, "contracts cannot be deemed unconscionable 'simply because of a disparity in bargaining power.'" *Id.* at 235 (quotation omitted). And Cap Specialty has not put forth any evidence that the Independent Subcontractor Agreement was presented to Garros in a "take-it-or-leave-it" manner or that Bachman's exerted any undue pressure upon Mr. Garro to sign it. In fact, it appears that Mr. Garro reviewed the agreement with his wife and signed it while he was at home, without a representative of Bachman's present. (ECF No. 21-12 at 27:17-20, 29:13-18.) Likewise, Cap Specialty has not put forth any evidence regarding the degree of economic compulsion that Mr. Garro was under when he signed it. At most, Mr. Garro confirmed that he wanted to get working for Bachman's to make some money and testified that "[w]hen I signed it, I signed it because all I wanted to do was work." (*Id.* at 50:20-21.) These facts do not rise to the level of procedural unconscionability.

Nor is there evidence of substantive unconscionability. "A contract or provision is substantively unconscionable where it 'unreasonably favors the party asserting it.' Put another way, '[s]ubstantive unconscionability refers to contractual terms that are unreasonably or grossly favorable to one side and to which the disfavored party does not assent.'" *Quilloin*, 673 F.3d at 230 (quotations omitted). Cap Specialty contends that the Independent Subcontractor Agreement

is substantively unconscionable because it defines "Contract Documents" to include the "Conditions of the Contract between the Owner and the Contractor (General, Supplementary and other Conditions" and because the agreement requires Garros to assume towards Bachman's all of the obligations and responsibilities that Bachman's assumes towards the Owner, to the extent those obligations relate to Garros' work on the project. Those provisions just ensure that as a subcontractor, Garros performs the work that a property owner hired Bachman's to complete. Moreover, those same provisions make clear that Garros "shall have the benefit of all rights, remedies and redress against [Bachman's] which [Bachman's] … has against the Owner[.]" (ECF No. 20-3, Ex. A at ¶ 3.) Thus, these terms are not unreasonably or grossly favorable to Bachman's.

### 3. Bachman's joinder complaint in the *Andrade* Action is not proof of the Independent Subcontractor Agreement's inapplicability.

According to Cap Specialty, if Bachman's thought the Independent Subcontractor Agreement applied to Garros's work on the Scotto Project, then Cap Specialty would have initiated arbitration against Garros rather than filing a joinder complaint in the *Andrade* Action. But Bachman's decision does not provide any insight into Bachman's understanding of the Independent Subcontractor Agreement. At most, it shows that Bachman's made a decision, whether motivated by strategic or efficiency reasons (or both), not to invoke the arbitration provision. In any event, the Joinder Complaint makes clear that Bachman's position regarding application of the Independent Subcontractor Agreement in the *Andrade* Action is the same as it is here: the Independent Subcontractor Agreement governed "all future work to be performed by Garros Remodeling at the request of Bachman's Roofing," and at the time of Mr. Andrade's accident, "Garros Remodeling was performing roofing work at the Subject Property pursuant to the terms of the Subcontract." (ECF No. 21-7 at ¶¶ 12-13.) Thus, there has been no admission by Bachman's that the Independent Subcontractor Agreement did not apply to Garros' work on the

Scotto Project. None of these asserted defenses warrant summary judgment in Cap Specialty's favor.

## IV. CONCLUSION

The undisputed evidence establishes that the Independent Subcontractor Agreement governed all of the work that Garros performed for Bachman's, including the Scotto Project. Because Garros agreed to add Bachman's as an insured as part of that agreement, Plaintiffs are entitled to summary judgment on their claims against Cap Specialty. An appropriate Order follows.

**BY THE COURT:**

*/s/ Joshua D. Wolson*
JOSHUA D. WOLSON, J.

April 29, 2021